FORT WORTH & DENVER CITY RAILWAY COMPANY v. S. B. LONGINO.

Decided February 20, 1909.

**1.—Railroads—Duty to Keep Lookout.**

Railroad companies are charged with the duty of exercising ordinary care to discover persons on their tracks and to avoid injuring them at those places where, under all the circumstances, they are reasonably chargeable with notice that such persons are liable to be, and it can make no difference so far as the duty of the company is concerned whether such persons are technically to be classed as trespassers, licensees or persons using the company's track as a right. This duty is imposed because of the broad rule of humanity that one engaged in so dangerous a business is required to exercise ordinary care to avoid injuring another when the presence of and danger to such other person is reasonably to be anticipated.

**2.—Same—Walking on Track—Contributory Negligence—Question of Fact— Case Discussed.**

In a suit for damages for personal injuries caused by being struck by a locomotive while plaintiff was walking on the defendant's track, evidence considered, and held to raise a question of fact as to whether or not plaintiff was guilty of contributory negligence in walking on said track, and the trial court therefore properly refused to instruct a verdict for defendant. Texas Midland Ry. Co. v. Byrd, 102 Texas, 263, discussed.

**3.—Same—Personal Injury—Presumption of Care.**

Where plaintiff was struck by a locomotive and injured while walking on a railroad track, held, under the circumstances of this case, that the presumption should be indulged as against a charge of contributory negligence that he did look and listen for approaching trains before entering on the track.

**4.—Same—Walking on Track—Contributory Negligence—Question of Fact.**

Whether or not a person struck by a locomotive and injured while walking on a railroad track is guilty of contributory negligence depends so largely upon an infinite variety of circumstances that it ought in all cases to be submitted to the jury as a question of fact, except in those cases where the undisputed evidence shows that the injured person exercised no care whatever for his own safety.

Appeal from the District Court of Tarrant County. Tried below before Hon. Irby Dunklin.

*J. M. Chambers* and *Spoonts, Thompson & Barwise,* for appellant.— It was the duty of the appellee to look and to listen for approaching trains before he went upon the appellant's track. The testimony showed that the train which struck appellee was plainly within his view and approaching him when he went upon the track. He knew that a train was likely to pass at any moment, and no room for doubt is left under the testimony, but that he either wholly failed to look for the approaching train or so carelessly looked therefor as that he did not see the train, which was in fact then close to him and approaching, or else he saw the train, but nevertheless went on the track ahead of it.

The proof disclosed an entire absence of any care on the part of appellee in discovering the presence of the approaching train, and the trial court should have peremptorily directed a verdict for the appellant, its refusal to do which is reversible error. Texas & P. Ry. Co. v. Ball, 96 Texas, 625; Galveston, H. & S. A. Ry. Co. v. Bracken, 59 Texas, 73; Sanches v. San Antonio & A. P. Ry. Co., 88 Texas, 118; International & G. N. R. R. Co. v. Edwards, 100 Texas, 22; Texas & P. Ry. Co. v. Fuller, 5 Texas Civ. App., 660; Ft. Worth & D. C. Ry. Co. v. Wyatt, 35 Texas Civ. App., 119; Bennett v. St. Louis S. W. Ry. Co., 36 Texas Civ. App., 459; St. Louis S. W. Ry. Co. v. Branom, 73 S. W., 1065; St. Louis S. W. Ry. Co. v. Shiflet, 98 Texas, 331.

*Capps, Cantey, Hanger & Short,* for appellee.

SPEER, Associate Justice.—Appellee recovered a judgment against appellant for the sum of seven thousand dollars for personal injuries, and the latter has appealed.

The principal issue arising on the appeal is one growing out of appellant's plea of contributory negligence and upon which it now insists the court should have instructed a verdict in its favor. The testimony which is claimed to necessitate such instruction is thus set out by appellant:

J. W. Finney testified as follows: "I remember the occasion of young Longino getting knocked off the railroad track there. On that day I was at home. I was right in the lot. . . . From the place where I was standing I could see the Denver track, both north and south—could see it north and south of the county road where it crosses. . . . I was looking there at the time he was knocked off the track. . . . There are two tracks there right together, about fifty feet off—maybe one hundred feet apart. . . . My attention was first attracted by the Cotton Belt freight blowing—coming by on the Cotton Belt. The Cotton Belt track was farthest south; the Denver track was nearest to me. The Cotton Belt was coming out blowing northeast, and that attracted my attention, and I looked down there and I saw the Denver coming into town, and there was a man coming this way and two men going the other way; I mean one man coming towards me and two men going towards town on the Denver. . . . I have been on the track there along about where the young

man was knocked off, and have made observations back up towards the northeast. You can see the track back towards the northeast for a quarter of a mile or further. You could see any one walking along on the track if they was on it—nothing at all to obstruct the view. . . . What first attracted my attention was the whistle or something on the Cotton Belt coming this way. When I looked at it the passenger train was about—maybe—100 yards above the crossing— something like that—above the county road crossing when I saw it. I saw it as it crossed the crossing—kept watching it come right up; I saw it until it got right at them. . . . It is true that as you go down that road from your (my) house, or the house where he (plaintiff) lived—go down the road to the south in the direction of the Fort Worth & Denver track—that by looking up there to the right you can see that track all the way from Hodge clear down. . . . For a space of 150 yards there, as a man would travel towards that track, there is no reason in the world why he couldn't see a train coming down from Hodge south if he had looked. It is about a mile from my place up there to the old station of Hodge. . . . The Cotton Belt that I was speaking of was going in the direction of Hodge, and the passenger train that I speak of, having struck this boy, was coming from Hodge in the direction of Fort Worth. . . . When my attention was drawn down there by the whistle of the Cotton Belt train, these two boys were just starting in on the Denver railroad. They had just about gotten to the track—to the Denver track—when my attention was drawn to the Cotton Belt train by its whistling, and I looked down there. The passenger train was about one hundred yards—something like that—above the dirt road. It had not got to the dirt-road crossing by about one hundred yards. About that time these boys were just turning on to the railroad track; this boy and the boy with him went on to the railroad track there in broad daylight, with the passenger train about one hundred yards off coming. They could have seen it if they had looked back up the track something like three hundred feet; I couldn't say, but then it was not very far. . . . The boys were running. They were on a long run in the middle of the track. I reckon my attention was turned to what they were doing after that. They were running pretty lively. They never looked back from the time they got on that track until they were hit, that I saw. A man would have to go down there to get on the inside of that enclosure— walk over that cattle-guard—if he got over that bridge, in order to travel that way to the packing houses. When they got down there, these 300 or 400 yards that I speak of, they walked out over another stock gap. . . . I do not know of any other way of fencing it so as to keep stock and people off of this track. Have never seen any other way for the railroads to keep them out. At the time I saw the Denver train, it was then approaching the boys and they were going in the direction away from the train. They did not look back, or anything—check speed or make any effort to get off while I was looking at them. At the time I looked up the train was about one hundred yards north of the county road. They continued down the track."

A. C. Russell testified as follows: "I recollect the incident of a young man being hit by a passenger train beyond the Kolp elevator

in December, 1904. We were going to work on the 27th of December. . . . At the time plaintiff was hit I was helping to set the handcar off out of the way of the train, I suppose. . . . When we had our car on the track we were going north, and the train was coming our way. . . . I suggested that some one go out and flag against the train, for we were running on the train time, and one of the men, Blakeley, got off, said he would go out and flag, and he went on and we kept going on slow and kept a lookout for the train, and before we got a signal I saw him stop; I saw the train coming. Just then it started to blow for the crossing and we stopped then to set the car off. . . . I was looking up the track until I saw the train coming— until the train commenced to whistle. Just before I turned to take hold of the handcar there was two men got on the track at that crossing and turned, coming south, coming in a long, running walk, tolerably pert. I couldn't tell which way they come from. They just got on the track, just as I saw the train. I never noticed them until they stepped into the track. The train was then in my view. I was about 150 or 200 yards south of the public crossing. . . . That crossing whistle sounded just before I saw those boys on the track. I saw the train just—you might say—for a second before I heard the whistle. . . . When I first saw the man that got knocked off I was about 200 yards from him, I suppose. . . . Immediately after the crossing whistle, these two men come on to the track. That is the first I saw of them. When I saw them I had already heard the whistle for the crossing. It all occurred about the same time. . . . I heard the crossing whistle before I ever saw the men, and the crossing whistle was about at the whistling post. . . . I suppose the post is a quarter of a mile from the crossing."

Fred Blakeley testified by deposition as follows: "I was flagging ahead of a handcar and was looking directly at the man just as he was struck, and had just told them to look out for the train. . . . The men got on the railroad track to the north of me some 200 feet, I suppose, and from there to the point where he was struck I suppose it was some 250 or 300 feet in a southerly direction from where he got on the track. There was another person with the party that was struck. . . . I saw both parties before they were struck by the engine. I saw them just before they got on the railroad track. They were then in the dirt road crossing the railroad track; that is, the road crossed the track. They were running along that dirt road. . . . They left the dirt road and were running on the railroad track south. When these parties were even with me, or near me, I said to both parties: 'Look out for the train!' That was a short time before the train struck him."

The witness Hoard testified thus: "I went out with him (appellee) the evening before. . . . Going out there we went up around back of the packing house and walked across there. We went across this road—the Denver road. This accident happened on the Denver road. The next morning after we started back we crawled through, I believe, the same place where I came along the next day after my suit-case; I went the same road that I went in the evening before, and that was up the Denver road. To get in the right of way we crawled

through the fence where the fence was; you might say we walked through it; the wire was down and up; it was a gap that we could walk through, bending so; we didn't have much trouble getting through. . . . Next morning I started to town with him. We came down the road until—there is a public road there—we came down the road until we got to the railroad and then we walked up the gap, just across, and got on to the railroad and came down the railroad track. When I stepped on the track I seen a train on the Cotton Belt —a freight train—but at this time on this road no train was heard nor seen by me. We started down the track. We were running along, you might say, in a trot down the track, and had gone at least something like 150 yards, . . . maybe a little further, and while we were going down the track this train on the Cotton Belt was going north, and I heard a whistle and seen the steam from the valve, and we were watching—and we were watching this train. . . . There was a man walking up the track—the track that I was on. He was off to the side of the track that I were on, and I spoke to him. . . . I spoke to him and then I jumped. At the time I jumped there was a train coming up behind us. . . . Mr. Longino, I guess, was—I couldn't say—maybe eight or ten feet ahead of me as I called to him. The last I seen of him was as he made—when he turned his head this way, why, he seen the train, and he made an effort to get off. . . . I jumped off, and after I jumped I called to him and saw him look back to the left, and he made an effort to get off; he jumped out; it·caught him, and I couldn't say, it carried him, I guess, fifty yards, and he fell on the same side that I was on. . . . Before we got to the railroad track we started in a slow trot. We were not exactly running. When we got to the railroad track we crossed over the cattle-guard on to the inside of the railway enclosure and on to the track. We were going in a slow trot down the track— just a slow trot. This fellow that I speak of as having met and halloaed at me was coming towards us. . . . He was walking on the left side of the embankment. . . . It (the Cotton Belt train) was nearly opposite me by the time Longino got struck. The engine was somewhere near me by that time. I had been watching this. I had been watching it at the time. I was watching the engine and the train at the same time. Longino was running a little bit ahead of me. I had been watching this Cotton ·Belt train as I was going down there. . . . I hadn't looked back up there just at that time to see whether there was any train coming, but I looked up to the road near the house on to the track, and there was nothing that I could see. I didn't see any train up there about one hundred yards. There was a small cut there and I wouldn't say how far I could see. I did not stand there on the track and look at all. I looked just about the time we got on the track. I glanced up the track and down it, to see if there was a train, and there was nothing I could see. I didn't make no stand. I don't say I turned and looked both ways for a train; I looked both ways."

Appellee himself testified as follows: "I remember leaving the house that morning. I remember after we got out of the yard. I remember of closing the front gate. I don't remember anything else that oc-

curred that day. . . . I knew that that railroad track was used daily for running trains over it. I had seen trains going back and forth over that track. I knew that the railroad company had partly fenced its track. . . . I don't recollect going down that road to the railroad track that morning on which I was hurt. I don't know a thing after I closed the gate that happened that day. . . . At that time the condition of my eyes was good. I could see. I guess they were as good as any ordinary eye. I have my own ears, and I reckon they are as good as anybody's. That morning before I was hurt there was nothing wrong about me that I know of."

It is undisputed that the track at the place of the accident had been long used as a footway by the public generally, and the evidence tends to show that this was the most practicable and most used route open to appellee, and the train was thirty minutes behind time.

The issues were thus submitted in the charge of the court: "If you believe from the evidence that at the time of the accident in controversy, and for a long time prior thereto, that portion of defendant's track on which plaintiff was traveling on the occasion of the accident was, and had been, commonly and habitually used by the public as a pathway for travel by pedestrians, with the knowledge and acquiescence of the defendant; and if you further believe from the evidence that plaintiff did not discover the approach of the train in time to avoid being struck by the engine; and if you further believe from the evidence that persons of ordinary prudence, filling the respective positions of engineer and fireman of said engine, would, under the same circumstances, have been on the lookout for pedestrians on said track, at the place where plaintiff was traveling before he was struck, and could and would have discovered that plaintiff was on the track sooner than defendant's said engineer and fireman made such discovery, and, after making such discovery, could and would have sounded signals of the bell and whistle, or either, at such time and in such manner as to warn plaintiff of the approach of the train in time to have enabled him to leave the track before being struck by the engine, then you will find that the failure of the engineer and fireman to make such discovery and to sound such warnings was negligence, and if you so find, and further believe and find that such negligence, if any, was the proximate cause of plaintiff's injury, then you will return a verdict in favor of the plaintiff.

"The foregoing instruction, however, is given subject to the following instruction, to wit:

"If you believe from the evidence that at the time plaintiff went upon said track at the road crossing immediately prior to his injury, he failed to look and listen, or to do either, to discover whether or not a train was approaching from the direction of Hodge station, and that by so looking and listening, or both, he could have discovered that said train was approaching, and in failing so to do he was guilty of negligence; . . . or if you believe from the evidence that after starting down said track he was guilty of negligence in failing, if he did fail, to discover the approach of said train in time to have left the track before he was struck by the engine of said train; . . . or if you believe from the evidence that had plaintiff been traveling on

the outside of the rails of said track instead of between the rails, he would not have been injured, and that he was guilty of negligence in traveling between the rails instead of on the outside thereof, . . . then in any one or more of said contingencies you will return a verdict in favor of the defendant, independent of any findings you may make on any other issue submitted to you in this charge.

"If you do not believe, from all the facts and circumstances in evidence, that the engineer and fireman on the engine which struck plaintiff were guilty of negligence in failing to sound warnings of the approach of said train, other than the warnings you believe were sounded, then you will return a verdict in favor of the defendant.

"If plaintiff's case has not been made out by a preponderance of the evidence, you will return a verdict in favor of the defendant."

*Opinion.*—We take it to be well settled that railroad companies are charged with the duty of exercising ordinary care to discover the presence of persons on their tracks and to avoid injuring them at those places where under all the circumstances they are reasonably chargeable with knowledge that such persons are liable to be; and in our judgment it can make no difference, so far as the duty of the railroad company is concerned, whether such persons are technically to be classed as trespassers, licensees, or persons using the company's tracks as of right. In all such cases the duty is imposed because of the broad rule of humanity that one engaged in so dangerous a business is required to exercise ordinary care to avoid injuring another when the presence of and danger to such other person is reasonably to be anticipated. That this rule extends to those places where the railroad company's track is commonly used as a footway has been too often held to enumerate. It is pointedly stated in Gulf, C. & S. F. Ry. Co. v. Smith, 87 Texas, 357: "That there may be no mistake hereafter as to the effect of Railway v. Matula, we announce the rule that railroad companies at crossings and such portions of its track as may be commonly used as footway or crossing, which is known to the company and at which persons may be expected, must use ordinary care to discover their presence and to avoid inflicting injury upon them. (St. Louis & T. Ry. v. Crosnoe, 72 Texas, 79), and that in the exercise of that degree of care they must use such an amount of vigilance and caution as a man of ordinary prudence would use under like circumstances."

Indeed, appellant does not controvert in the least this proposition, but the insistence is that notwithstanding its negligence in this respect the appellee can not recover because of his own contributory negligence. The very recent case of Texas Midland R. R. Co. v. J. W. Byrd (102 Texas, 263) is pressed upon us in support of this contention. In the opinion in that case the Supreme Court quotes Mr. Justice Williams's language in Gulf C. & S. F. Ry. Co. v. Matthews, 100 Texas, 63, as follows: "An implied permission, such as is claimed, to use a railroad track as a footpath may relieve the person enjoying it of the imputation of being a trespasser, but it does not relieve the place of its inherent dangers, nor exempt the traveler from the duty to act with ordinary prudence. When he voluntarily chooses the dan-.

gerous pathway instead of a safe one beside it, we can see no escape from the conclusion that he is guilty of negligence, if there be no justifying or excusing circumstances." In the case under review the facts show that the plaintiff, while walking over the bridge of the defendant, which was one hundred and ninety-five to two hundred feet in length, discovered a train approaching, and in order to escape being struck thereby, attempted to jump off the bridge, and in doing so was injured, and it was held that it was "apparent from plaintiff's own testimony that there were other ways of going to his destination by which the crossing of the bridge might have been avoided, and he having selected a way he knew to be dangerous, his conduct must be considered negligence on his part. Giving all the effect of implied license to use the bridge as is claimed for it in this case, it could hardly be said that it implied a license to use the structure to the obstruction of the defendant's business." While, as we read the case of Gulf, C. & S. F. Ry. Co. v. Matthews, *supra,* the latter part of the quotation above made, upon which is based the decision in the Byrd case, is wholly a dictum in that the court expressly there found that there was not a safe place to walk beside the track, yet the dictum of yesterday has become the decision of today, and we are confronted with the question whether or not the holding in the Byrd case is decisive of the present appeal.

It is not quite clear from the report of that case either by the Supreme Court or the Court of Civil Appeals (110 S. W., 199, and 102 Texas, 263), just what were the "other ways of going to his destination by which the crossing of the bridge might have been avoided by the deceased, Byrd," yet, however that may be, we think it is quite clear the trial court could not summarily have instructed a verdict for appellant in this case upon the theory that there was a safe way alongside of the track by which appellee could have traveled and thus have averted the injury. That there was such a way at all is but an inference deducible from the evidence, and the same can not in anywise be said to be an undisputed fact requiring such an instruction. The Supreme Court further say in the decision of the Byrd case: "We think that the doctrine upon which the license of the railroad company is implied by the use which persons put it to, by using it as a footpath, has been pushed far enough in this State, and we are not inclined to let it go any further." But we, in view of the long and unbroken line of decisions in this State to the effect generally that contributory negligence is a question of fact for the determination of the jury under all the circumstances, are not inclined to push the doctrine of that decision any further than we are required to do so. It would perhaps be an injustice to say that the Supreme Court meant that the doctrine should be carried further than announced by it in that case, but clearly, in our judgment, if the Supreme Court meant to announce the broad doctrine as now contended for by appellant, that a licensee upon a railroad track is necessarily guilty of contributory negligence because he has gone into a place of danger and been injured in consequence, then the case ought speedily to be overruled.

We are aware of the rule announced in International & G. N. Ry. Co. v. Edwards, 100 Texas, 22, to the effect that while persons using

a railway crossing have the right to expect that the law requiring signals will be obeyed, yet this is not a substitute for the duty of exercising care for themselves; and this rule is perhaps nowhere more broadly stated than by this court in Ft. Worth & D. C. Ry. Co. v. Wyatt, 35 Texas Civ. App., 119, wherein we stated: "There are many authorities holding as matter of fact that one who goes upon a railroad track without taking the precaution to look and listen for approaching cars, and is injured by a car which he might have discovered by the exercise of such diligence, is guilty of such negligence as will preclude a recovery by him." And so it ought to be held in any case, we think, whether the injured person be merely a licensee or one lawfully entitled to use the track as of right. He ought to be required in all cases to exercise ordinary care for his own safety, and where it is undisputed that such person exercised no care whatever, he of course must be held to have been guilty of contributory negligence. In the present case we do not think it can be said from the evidence that appellee exercised no care whatever for his own safety in entering upon appellant's track and continuing thereon until he was injured.

In Texas Midland R. R. Co. v. Crowder, 25 Texas Civ. App., 536, in which a writ of error was refused, it is said: "While the evidence fails to definitely show that Crowder looked and listened before stepping on the track, it is not doing violence to the evidence to assume that he saw the engine and cars at the south end of the switch and concluded that they would not then be backed down at that time, or, if so, that a proper lookout would be kept and that proper signals would be given to warn him in time to leave the track to prevent injury." Crowder was killed in that accident, which accounts for the presumption thus indulged. While here appellee was not killed, yet the fact appears to be undisputed that he was so injured that he was unable to recall anything connected with the transaction from the time he left his home in the morning until some days or weeks after the accident. So that we think the humane presumption that he did at least look and listen for approaching trains before entering upon appellant's track ought under the circumstances to be indulged, as was done in the Crowder case. Besides, there is the further circumstance that he was in company with another who did to some extent, at least, look for an approaching train before going upon the track. In a general way we think we are in line with the trend of the decisions in this State when we adhere to the rule that whether or not a person injured on a railroad is guilty of contributory negligence depends so largely upon an infinite variety of circumstances that it ought in all cases to be submitted to the jury as a question of fact, except in those cases where the undisputed evidence shows that the injured person exercised no care whatever for his own safety. In the very nature of things even to hold that one is guilty of contributory negligence when he might have selected a safe way is in some measure to invade the province of the jury, for the solution of that question depends at last upon whether or not a reasonably prudent person would have taken the safe way, and this in turn is determined by an infinite variety of circumstances, such as the proximity of the way, its condition, the condition of the railroad as a way, the frequency of its use by the public,

the frequency of the passage of trains or cars on it, the probability of such trains or cars being then about to pass, the presence or absence of watchmen or signals, the diligence exercised in the matter of looking and listening for approaching trains, and other things too numerous to mention, which ought to and do influence human conduct every day. The rule is firmly and sanely held in this State that one using the tracks of a railway company may introduce evidence of the proximity of crossings, stations and the like, and of the custom of the company to blow its whistle and sound its bells for such places, upon the issue of his own contributory negligence in being on the track. (International & G. N. R. R. Co. v. Woodward, 26 Texas Civ. App., 389.) And further, that the failure to give such signals may, as to such person, constitute actionable negligence. (Missouri, K. & T. Ry. Co. of Texas v. Saunders, 101 Texas, 255.)

It is a fact known of all men that persons on a railway track are likely to take notice of the manner in which trains are required to be run, and in fact are run, and in some measure to depend upon the companies operating their trains in the usual manner, and thereby to rely upon the exercise of the usual precautions for the safety of those whose presence on the track is to be anticipated. From this well-recognized principle, we think it necessarily follows that the issue of contributory negligence on the part of a person injured on a railroad track, whose very presence is thus largely influenced by his reliance on the known custom and usual conduct of the railway company to exercise care to avoid injuring him, is at last a question of fact for the determination of a jury.

As applied to this case, the appellee, who is not conclusively shown not to have exercised any care for his own safety but who presumptively did at least look and listen for the approach of appellant's train, relies upon the known duty of appellant to exercise ordinary care to keep a lookout for his presence along the well-beaten path on its track, and by reason of its failure in this respect is injured. We can not say under such circumstances that he is guilty of contributory negligence as matter of law. So that we conclude the trial court did not err in refusing to give a summary instruction for appellant.

We also conclude that the evidence is not such as to require us to set aside the verdict and judgment for want of evidence, and that the court committed no errors in his rulings on evidence, or otherwise. The charge set out succinctly and clearly presented the material issues of the case and sufficiently embraced the requested charges.

The judgment is therefore in all things affirmed.

*Affirmed.*

Writ of error granted.
Judgment affirmed.