### *ST. LOUIS & S. F. R. CO. v. HODGE.

No. 3950. Opinion Filed January 11, 1916.

Rehearing Denied April 25, 1916.

(157 Pac. 60.)

1. **REMOVAL OF CAUSES—Determination of Right—Jurisdiction of State Court.** A state court is not bound to surrender its jurisdiction of a pending action on a petition for its removal into the District Court of the United States until a case has been made which on its face shows that the petitioner has a right to the transfer. All issues of fact made on the petition for removal must be tried in the federal district court, but the state court is at liberty to determine for itself whether, on the face of the record, a removal has been effected.

2. **SAME—Pleading.** Where the petition for removal of a cause shows that the plaintiff "at the time of the commencement of the suit was, and now is, a citizen and resident of the State of Oklahoma," and that defendant at said times was a corporation organized under the laws of the State of Missouri, and a citizen and resident thereof, while the plaintiff's petition shows that both plaintiff and his next friend and mother were at all

*Appealed to the Supreme Court of the United States.

times named therein "residents, citizens, and inhabitants of Snyder. * * * in the Western Judicial District of the United States for the State of Oklahoma," and where jurisdiction of the district court is founded only on the fact that the action is between citizens of different states, consideration may be given the plaintiff's petition (it constituting a part of the record) in determining the question of removability.

3.     SAME—Diversity of Citizenship—Court to Which Removed. An action brought in a state court outside of the federal court district of the plaintiff's residence is not, on objection by plaintiff, removable to the federal court on the petition of the defendant, who is a resident of another state, as sections 1 and 2 of Act Cong. March 3, 1887, c. 373, 24 Stat. 552, as amended by Act Cong. August 13, 1888, c. 866, 25 Stat. 433 (U. S. Comp. Stat. 1901, pp. 508, 509), provide that, where jurisdiction of the federal court is founded upon diversity of citizenship, suit shall be brought only in the district of the residence of either plaintiff or defendant, and that suits of a civil nature, at law or in equity, may be removed into the federal court for the proper district by the defendant or defendants therein, being nonresidents of the state. To permit the removal would not take the cause to "the proper district" within the meaning of the statute, but, instead, into a district of which neither plaintiff nor defendant was a resident.

4.     RAILROADS—Trespassers—Licensees—Duty to Avoid Injury. A railroad company owes no duty to mere trespassers upon its tracks except to avoid unnecessary injury to them after their presence on the premises is discovered; but, where there exists a license, either express or implied, to the children of a community to go upon and across the tracks in the yards of the company, where for a long period of time, with knowledge of the company's servants and employees, they have been accustomed to gather for play or to pick up coal in the yards of the company and near its coal chute, the company is bound to use reasonable care to avoid injury to those whose presence there it may reasonably anticipate.

5.     SAME—That children on some occasions had been warned not to take coal or play about the premises of the company did not absolve the company from its duty to exercise reasonable care in operating its trains in the yards, where it was shown that the former custom had not been discontinued.

6.     SAME — Injury to Licensee — Proximate Cause — Question for Jury. The proximate cause of an injury is ordinarily for the jury, and is to be determined as a question of fact, in view of the circumstances of fact attending it.

7.     APPEAL AND ERROR—Invited Error—Instructions. Instructions to the jury that are in substantial compliance with those

requested cannot be made the grounds of reversal at the instance of the party requesting them.

8.  **RAILROADS—Injury to Child Licensee—Instructions—Contributory Negligence.** An instruction to the effect that, if the jury believe and find from the evidence that the plaintiff (a boy 11 years old) was of sufficient age, intelligence, and experience to comprehend and appreciate the danger incident to his situation, under the circumstances of the case, and was injured by reason of negligence on his part, measuring his conduct by the standard that is to be expected from children of his age, capacity, and understanding under like circumstances, and which negligence was the proximate cause of his injury, and that in such event plaintiff would be guilty of contributory negligence and could not recover, it being admitted that plaintiff was acquainted with the dangers incident to the operation of freight trains while being made up in the railroad yards, does not incorrectly state the law; as "children of his age, capacity, and understanding under like circumstances" refers to children such as plaintiff, acquainted with the dangers arising out of the movement of freight trains while switching and being made up.

9.  **SAME—Evidence of Habit.** Evidence of the railroad company in support of its claim of contributory negligence, that plaintiff, a boy 11 years of age, was in the habit or custom of crawling underneath the cars whenever he found the track blocked and desired to cross over said track. the boy himself being a witness, was, for the reason stated in the opinion, inadmissible, and hence properly excluded.

10.  **APPEAL AND ERROR—Excessive Verdict—Decision on Appeal.** While in an action for personal injury a verdict will not be. set aside for excessive damages, unless it clearly appear that the jury committed some gross and palpable error, or acted under some improper bias, influence, or prejudice, or have totally mistaken the rules of law by which damages are regulated, yet, where from the size of the verdict it is apparent that it was given under the influence of passion or prejudice. the court may direct a reversal of the case, or give the plaintiff the option to remit the excess, and allow the judgment to stand as modified.

11.  **DAMAGES—Personal Injuries—Excessive Recovery.** Evidence examined, and the verdict of $20,000 **held** to be so excessive as to amount to a miscarriage of justice, and that the same should be set aside and a new trial granted unless a **remittitur** is filed for all in excess of $15,000, and interest thereon from date of judgment.

(Syllabus by the Court.)

*Error from District Court, Marshall County;
Summers Hardy, Judge.*

Action by Edgar E. Hodge, a minor, by his next friend, Mrs. D. J. Hodge, against the St. Louis & San Francisco Railroad Company. Judgment for plaintiff, and defendant brings error. Affirmed on condition of *remittitur.*

*W. F. Evans, R. A. Kleinschmidt,* and *E. H. Foster,* for plaintiff in error.

*A. F. Moss, V. E. McInnis,* and *M. E. Turner,* for defendant in error.

SHARP, J. On the 9th day of February, 1911, Edgar E. Hodge, a minor, by his next friend and mother, Mrs. E. J. Hodge, instituted in the district court of Marshall county against the St. Louis & San Francisco Railroad Company an action to recover damages on account of an injury sustained by the said Edgar E. Hodge on account of the alleged negligence of defendant's servants and employees in the operation of one of its trains. At the trial plaintiff recovered a verdict for $20,000, from which the present proceedings in error have been prosecuted.

Among other errors complained of, and the first that commands attention, is that the trial court erred in refusing to enter an order of removal to the federal court. The petition for removal charges that at the time of commencement of said action the plaintiff was a citizen and resident of the State of Oklahoma, and the defendant was a corporation organized under the laws of the State of Missouri, and a citizen and resident of that state. The petition for removal does not allege whether plaintiff was a resident of the Eastern or Western Judicial District of

Oklahoma. This fact is supplied in the petition of plaintiff, which charges that at all times therein mentioned both the plaintiff and his next friend and mother were residents, citizens, and inhabitants of Snyder, Swanson (Kiowa) county, in the Western Judicial District for the Circuit Court of the United States for the State of Oklahoma. It therefore appears that plaintiff was a resident of the Western District, while Marshall county, where the action was pending, is in the Eastern District of Oklahoma. In determining the question of law presented to the state court, consideration may be given, not only to the petition for removal, but to the petition of the plaintiff and the pleadings and proceedings down to that time. *Western Coal & Mining Co. v. Osborne,* 30 Okla. 235, 119 Pac. 973; *Chicago, R. I. & P. Ry. Co. v. Brazzell,* 33 Okla. 122, 124 Pac. 40; *Phoenix Ins. Co. v. Pechner,* 95 U. S. 183, 24 L. Ed. 427; *Stone v. State of South Carolina,* 117 U. S. 430, 6 Sup. Ct. 799, 29 L. Ed. 962; *Burlington, C. R. & N. R. Co. v. Dunn,* 122 U. S. 513, 7 Sup. Ct. 1262, 30 L. Ed. 1159. The allegation of plaintiff's petition stating the particular district of the residence of both plaintiff and his mother and next friend in no wise conflicted with the petition for removal. *St. Louis & S. F. R. Co. v. Kitchen,* 98 Ark. 507, 136 S. W. 970, 50 L. R. A. (N. S.) 828. There was then presented to the state court purely a question of law, upon which it was to determine whether or not the action was removable to the federal court. This involved a determination of the proposition whether or not an action brought in a state court, outside of the federal court district of the plaintiff's residence, is removable on petition of the defendant, who is a citizen and resident of another state. By section 1 of the act of Congress of March 3, 1887 (24 Stat. at L. c. 373, p. 552), as corrected

and amended by the act of August 13, 1888 (25 Stat. at L. c. 866, p. 433), it is provided that:

"Where the jurisdiction is founded only on the fact that the action is between citizens of different states, suit shall be brought only in the district of the residence of either the plaintiff or the defendant."

The statute further provides in section 2, that:

"Any other suit, of a civil nature, at law or in equity, of which the Circuit Courts of the United States are given jurisdiction by the preceding section, * * * may be removed into the Circuit Court of the United States for the proper district by the defendant or defendants therein, being nonresidents of that state." ·

The question was before the United States Court for the Eastern District of Oklahoma in *Shawnee Nat. Bank v. Missouri, K. & T. R. Co.* (C. C.) 175 Fed. 456. There the Shawnee National Bank, a banking corporation organized under the national banking laws, located and doing business at Shawnee, in the Western Judicial District of Oklahoma, commenced an action against the Missouri, Kansas & Texas Railway Company, a corporation organized under the laws of the State of Kansas, in the district court of Seminole county, Okla., which county is in the Eastern District of the state. Thereafter, and within the time provided by law, the defendant filed its petition and bond for removal of said cause to the then Circuit Court for the Eastern District. On presentation of the application to the judge of the state court the same was denied, whereupon the defendant secured a transcript of the papers, files, and docket entries, which were filed in the United States Circuit Court, and the cause there docketed. The question of jurisdiction came up on plaintiff's motion to remand. After reviewing many authorities considered

controlling, the conclusion was reached by Judge Campbell that in a case removed to that court from a state court, upon the ground solely of diversity of citizenship, where it appeared that neither the plaintiff nor the defendant was a resident of the Eastern District, although the plaintiff was a citizen of the state and a resident of another district in the state, that court was without jurisdiction to proceed with the case over the timely interposition of plaintiff's objection thereto, where he had neither by express consent, nor by any act amounting to consent, waived the jurisdictional question.   The opinion quotes at some length from the case of *Mahopoulus v. Chicago, R. I. & P. Ry. Co.* (C. C.) 167 Fed. 165, where it was held by Judge Pollock that no suit or action is removable from a state to a federal court, unless it be one that the plaintiff could originally have brought 'in the Circuit Court to which the removal is sought.

"The right to removal," it was said in the *Matter of Dunn*, 212 U. S. 375, 29 Sup. Ct. 299, 53 L. Ed. 558, "under the statute, depends upon whether the suit could originally have been brought in the Circuit Court of the United States. *Madisonville Traction Co. v. St. Bernard Min. Co.*, 196 U. S. 239 [25 Sup. Ct. 251] 49 L. Ed. 462, 4C4; *Cochran v. Montgomery County*, 199 U. S. 260 [26 Sup. Ct. 58] 50 L. Ed. 152, 4 Ann. Cas. 451. The question then is whether the United States Circuit Court for the proper district [Northern District of Texas] would have had jurisdiction of a suit commenced in that district by the plaintiffs against the railway company and the two individual defendants."

And to the same effect it was said in *Re Winn*, 213 U. S. 458, 29 Sup. Ct. 515, 53 L. Ed. 873:

"It is well settled that no cause can be removed from a state court to the Circuit Court of the United States

unless it could originally have been brought in the latter court."

See, also, *Mexican Nat. R. Co. v. Davidson,* 157 U. S. 201, 15 Sup. Ct. 563, 39 L. Ed. 672; *Boston & M. Consolidated C. & S. I. M. Co. v. Montana Ore Co.,* 188 U. S. 632, 23 Sup. Ct. 434, 47 L. Ed. 626; *Ex parte Wisner,* 203 U. S. 449, 27 Sup. Ct. 150, 51 L. Ed. 264.

*In re Moore,* 209 U. S. 490, 28 Sup. Ct. 585, 52 L. Ed. 904, 14 Ann. Cas. 1164, does not sustain the contention made for it by counsel for plaintiffs in error. That case turned upon the question of waiver. There the defendant applied for the removal of the case to the federal court, and was on that account foreclosed from objecting to its jurisdiction. In like manner, after the removal had been ordered, the plaintiff elected to remain in that court, and it was held that he was, equally with the defendant, precluded from making objection to its jurisdiction. Here the plaintiff selected the state court in which to file his suit, and, it not appearing from the record that subsequent thereto she consented to a removal of it to the Circuit Court of the United States, the presumption would be that in the lower court, as here, objection to the removal was made. *St. Louis & S. F. Ry. Co. v. Kiser* (Tex. Civ. App.) 136 S. W. 853. In *St. Louis & S. F. R. Co. v. Kitchen,* 98 Ark. 507, 136 S. W. 970, 50 L. R. A. (N. S.) 828, the case presented the identical question before us. Federal jurisdiction in that case was dependent upon diversity of citizenship, as here, and it was held that a suit brought in a state court, outside of the federal court district of plaintiff's residence, was not removable to the federal court on the petition of the defendant, who was a resident of another state, on account of Act Cong. March 3, 1887 (24 Stat. at L. 552), secs. 1, 2, as amended by the

act of August 13, 1888 (25 Stat. at L. 433), which pro-
vides that, where the jurisdiction of the federal court is
founded upon diversity of citizenship, suits shall be
brought only in the district of the residence of either
plaintiff or defendant, and suits of a civil nature, brought
between citizens of different states, may be removed to the
federal court of the proper district by the defendant, and
to permit the removal to be made would "take the case
into the wrong district." It is a well-settled rule that a
state court is not bound to surrender its jurisdiction of a
suit on a petition for its removal into the Circuit Court
until a case has been made which on its face shows the
petitioner has a right to the transfer; that a mere filing
of a petition for the removal of a suit, which is not re-
movable, does not work a transfer. To accomplish this
the suit must be one that may be removed, and the petition
must show a right in the petitioner to demand a removal.
*Stone v. State of South Carolina,* 117 U. S. 430, 6 Sup. Ct.
799, 29 L. Ed. 962; *Crehore v. Ohio & Miss. R. Co.,* 131
U. S. 240, 9 Sup. Ct. 692, 33 L. Ed. 144; *Stuart v. Bank of
Staplehurst,* 57 Neb. 569, 78 N. W. 298; *Higson v. North
River Ins. Co.,* 153 N. C. 35, 68 S. E. 920. Section 3,
Judiciary Act Aug. 13, 1888, c. 866 (25 Stat. at L. 435),
according to its clear import, and as interpreted by the
Supreme Court, authorizes the removal of a cause from
a state court to the proper federal court upon the filing
of a petition disclosing the right to remove and the giving
of the prescribed bond. Upon the filing of such petition it
becomes a part of the record; and, if on the face of the
record so constituted a suit appears to be removable, the
state court in which the petition is filed is bound to sur-
render its jurisdiction and proceed no further. *Ft. Smith
& W. R. Co. v. Blevins,* 35 Okla. 378, 130 Pac. 525; *Dono-*

van v. Wells Fargo & Co., 169 Fed. 363, 94 C. C. A. 609,
22 L. R. A. (N. S.) 1250. Whether plaintiff might have
waived his right to object to the jurisdiction of the United
States court had the removal been ordered, and because of
the general jurisdiction of that court (St. Louis & S. F.
R. Co. v. McBride, 141 U. S. 127, 11 Sup. Ct. 982, 35 L.
Ed. 659) the case could have proceeded regularly therein,
is not a question we are called upon to determine. Whether
the application to remove was properly denied, and what
the effect would have been if the order of removal had
been made and plaintiff had waived his jurisdictional rights
in said court, are necessarily different questions. The
former is properly before us; the latter is not, and need
receive no further consideration.

Admittedly a railroad company has, as against tres-
passers, an exclusive right to the occupation and use of
its tracks within its yards, as well as of its tracks at
other points, and to persons trespassing it owes no duty
except to avoid injuring them unnecessarily after they
are discovered upon the premises. This right is essential
to the operations of the company in carrying on its busi-
ness, and no other or higher duty arises unless the facts
show that the person injured is upon the tracks with the
express or implied consent of the railroad company. If
the person is a licensee, the company is obliged to use
reasonable care to avoid injury to one sustaining that re-
lation; the reason of the doctrine being that, where the
company has the exclusive right to the use of its tracks,
and has neither impliedly nor expressly licensed persons
to be there, it has no reason to anticipate their presence,
and consequently is under no obligation to be on the look-
out, or to avoid injury to such persons. But, where they
may be expected to be, and where an implied license

has arisen from the conduct of the company, it is bound to use care commensurate with the circumstances to avoid injury to such persons. In such cases the company has imposed upon itself a precautionary duty which it is bound to discharge, or suffer the consequences. Whether the circumstances are such in a particular case as to give rise to this implied license is a question to be decided upon the facts as they may arise in each instance. Where it is claimed that no such license has been extended, and but one inference can be reasonably drawn from the circumstances, and that showing the person to be a trespasser, the question becomes one of law. Where, however, there is testimony showing that a license, either expressed or implied, arises from the circumstances, the question becomes one of fact, to be submitted under proper instructions to the jury; and the question therefore is: Was there such a situation shown as made it clear, as a matter of law, that the boy at the time of his injury was a trespasser, or had the circumstances given rise to such an implied license as made the question one to be submitted to the jury? The rule announced finds support in many well-considered cases, though a number of courts announce a contrary doctrine. In *Tutt v. Illinois Cent. R. Co.*, 104 Fed. 741, 44 C. C. A. 320 (in which case the opinion was prepared by Mr. Justice Day, now of the Supreme Court of the United States, Lurton and Severns, JJ., concurring therein), the plaintiff, a child six years old, was run over and injured by cars being switched in the yards of defendant railroad company while he was crossing the tracks. There was no public crossing at the place of injury, but it was in a thickly populated part of the city, the tracks were not fenced, and no watchman or warning signals were pro-

vided. The testimony of plaintiff tended to show that the place had long been used by children and others in crossing to and fro from a canal beyond, where boats passed and sometimes stopped, and that plaintiff shortly before the injury had crossed the tracks with an older sister, and was injured while returning therefrom. There was also evidence which made it a question of fact whether defendant was guilty of negligence in the operation of the train which would render it liable for the injury, provided plaintiff was not a trespasser. In reversing the case the court held that, notwithstanding evidence had been introduced that defendant had instructed its employees to keep persons away from the tracks, and that children had several times been driven away, it was a question of fact for the jury whether, under all the circumstances, plaintiff was there under an implied license which imposed upon the defendant the duty of exercising care to discover his presence and avoid his injury.

Where no statute controls, the common law must determine the duty of the railroad company in respect to the proper and prudent movement of its trains. That such companies have a right to a clear track, except where the public has an easement of way, must be conceded. But upon its general track, where the public have no equal easement or right of way, a railroad company may operate its trains without regard to the possibility that unauthorized persons may trespass thereon. It need not anticipate the presence of such intruders either upon its general track or in its strictly private yards. *Felton v. Aubrey*, 74 Fed. 350, 20 C. C. A. 436. The law imposes no duty in respect to trespassers upon a railroad track, except the general duty which every one owes to

every other person—to do him no intentional wrong or injury. If, therefore, the plaintiff was, on the undisputable evidence, a trespasser, no liability for his injury would attach. A correct determination of the case, therefore, must depend upon the facts and circumstances in respect of the place where the accident occurred, and necessitates at our hands an examination of the testimony in order that we may say by which of the rules indicated the case must be governed.

R. E. Hodge, 46 years of age, and half-brother of the plaintiff, testified that he had worked at the coal chute from April 21, 1909, until the date of the accident; that boys had been in the habit of picking up coal at the chute, and playing in the yards almost daily, and he had seen them do so in the presence of both the station agent and section foreman; that the witness had seen the same train crew switching around the coal chute while boys were playing and picking up coal at the chute; and that he knew of no warning ever being given the boys.

L. D. Chapman, 11 years of age, testified that he went to the coal chute about twice a week, sometimes for coal on the ground under the chute, and sometimes to play; that Perkins, the coal chute foreman, saw him and other boys there frequently; that the witness had gotten coal of mornings when freight trains were in the yards, and had played in the yards with the plaintiff near the coal chute about twice a week.

Marion Harvey, ten years old, testified that for about six months before plaintiff was hurt he was at the coal chute every day of the week except Sunday; that he would get a couple or three sacks of coal, take them to town, and return home; that he saw different boys at

the coal chute, some of them every day that witness was there; these other boys would get coal in sacks which was taken to town and sold, and that Perkins saw them there; that coal was obtained at times when trains were on the tracks near the chute, after the engines had coaled; that boys were accustomed to play there, and throw coal at birds and other objects; and that the witness frequently played with other boys at the coal chute, where he played for an hour or an hour and a half every evening.

Bernard Harvey, 13 years of age, and a brother of Marion, testified that he was at the coal chute about once a week for a year before plaintiff's injury; that he would fill his sack with coal and play around until about sundown, and that he saw Perkins almost every time he was there, but that Perkins said nothing to the boys about getting coal; that witness was at the coal chute at times when trains were switching in the yards and standing on the tracks near the chute.

Lester Harris, 15 years of age, testified that he visited the coal chute about twice a week for five months before the accident, sometimes to get coal, and at other times to play; that he saw Perkins almost every time he was there; and that the latter told him to wait until after the trains left before getting his coal.

Andrew Kelly, ten years of age, testified that he was at the coal chute about four times a week for the purpose of getting coal and playing with other boys; that no one ever told him not to take coal.

Alton Henry, 12 years of age, testified that he had been at the coal chute playing and picking up coal a good many times before plaintiff was hurt, sometimes with plaintiff and other boys; that he had been going to the

.coal chute for four or five months, sometimes when trains were switching in the yards, and had been told by Perkins that he was welcome to pick up the coal and save him the trouble of doing so; that the plaintiff was with him at the time, and that he was never told not to go to the coal chute; that he saw the agent, Broadstreet, three or four times while picking up coal; that he was told by Broadstreet not to play around "switch trains," but that this was after plaintiff was injured; that when he and other boys were picking up coal and playing around they saw the section foreman there every few days, but that nothing was said to him about picking up coal; that he saw conductors and brakemen working around there in the yards nearly every day while the boys were picking up coal or playing, but no attention was paid to them.

Charlie O'Dell, 15 years of age, testified that a good many of the boys were in the habit of picking up coal every day from the coal chute, and especially on Saturday, and that this practice had been indulged in ever since there was a town there, and was done in the presence of Perkins, who at no time said anything, except on one occasion when he told the witness to bring him a cigar now and then, and that he could have all the coal he wanted, and that he was told by no one not to pick up coal and play around.

H. R. Perkins testified that in July, 1910, and for four years and two months prior thereto, he was coal chute foreman at Snyder, and was present at the time of the accident to plaintiff; that it had been the practice of the boys ever since he had charge of the chute to pick up coal around the tracks at the chute, and that they congregated there for that purpose and to play almost every day, both during the winter and summer months; that he

had seen the boys picking up waste coal from the tenders, while trains were switching in the yards; that no warnings were posted at the coal chute against trespassing, and that he had no written instructions about warning boys away, but that he had told the boys it was dangerous and against the rules of the company to play around the coal chute and to pick up coal, though he had never told plaintiff not to do so; that, while he had warned trespassers against picking up coal or playing around on several occasions, he did not always do so.

D. J. Harris, who lived about 400 yards from the coal chute, testified that he had seen boys picking up coal on the tracks near the chute for almost three years, both winter and summer.

The plaintiff testified that he was 12 years of age, and at the time he went to the coal chute on the afternoon he was injured other boys were at the chute picking up coal; that after going up into the chute, he came down, and thought he heard some boys whistle across the track; that he went across to find them, but, not doing so, attempted to return to the west side of the track, within a few feet of the rear of the caboose, which at the time was standing still, but that as he stepped upon the track the engine struck the cars to which the caboose was attached, causing the caboose to hit him, knocking him backwards off the track; and that the car ran over his right leg and mashed his left foot. He testified, further, that he did not go to the coal chute every day, but that Mr. Perkins saw him there picking up coal, as did the station agent; sometimes the witness would be by himself, and at times with other boys; that the agent had never talked with him about staying out of the yards and leaving the coal alone.

Conductor Fowler testified that about a week or ten days before the accident he saw the plaintiff in the yards with another little boy, one of them having an express wagon loaded with coal, and that witness helped them to pull the wagon across the tracks; that he told the boys to stay out of the yards, as it was dangerous and against the company's rules; that at the time of the accident witness was at the depot getting his orders and handling waybills for his return trip to Vernon, Tex.

F. H. Broadstreet testified that the railroad station was about two blocks from the coal chute; that he was in the yards every day or so, but did not know that he had ever seen plaintiff there before his injury; that occasionally during the winter months boys would pick up coal from along the tracks. The witness stated that he had asked the city marshal and constable to watch the yards, and on two occasions, while the Henley boy was getting coal at the chute, the witness told him to stay out of the yards; that he also saw another boy there on one occasion, but that he did not see any one in the yards near the coal chute from the station; and that he had "stopped" boys probably ten times in four years. The witness further testified that he had seen one of the Gleason boys getting coal on two occasions.

Frank Taylor, a deputy sheriff, and Lee Gamble, city marshal, each testified about having seen plaintiff in the yards several times prior to the injury, and that he had been warned to keep out of the yards, and not to play around the cars, or to pick up coal around the coal chute. Taylor had been requested by Broadstreet, the agent, to keep the boys out of the yards.

The foregoing in the main constitutes the evidence which tends to show the common practice of the boys both

in getting coal and playing in the yards near the chute where plaintiff was injured.

The opinion of the Circuit Court of Appeals in *Felton v. Aubrey* correctly states the law governing such cases. While the facts in the two cases differ, there is such similarity between them as will authorize the application in the present case of the rule of law announced by the Circuit Court of Appeals. It will be noted that the opinion was by Judge Lurton, afterwards a member of the Supreme Court of the United States, and was concurred in by Taft and Hammond, JJ. The evidence here shows that for a number of years many boys in the town of Snyder had been in the habit of going to the coal chute, some of them daily, to pick up waste coal around the chute, and near where the engines coaled, and to play in the yards near the coal chute. That this practice was known to many of the company's employees was shown by the plaintiff's testimony, and by testimony introduced by the railroad company. Indeed, on acount of the habit of the boys, the station agent had complained to the local constabulary and police authorities. This practice, it was shown, was known, not only to the roundhouse foreman and other employees there, but also to the section men and train crews and, as we have seen, to the conductor of the train that caused the injury, who testified that about a week or ten days before the accident he assisted the plaintiff and another small boy to move their wagon of coal across the railroad tracks. While it is true that the accident did not take place in a populous city, or in a thickly settled neighborhood, as in some of the reported cases, such fact does not of itself relieve from liability. The rule is not dependent upon the density of population of the neighborhood, but upon the facts tending to establish an implied

license on the part of the company. After discussing at some length the authorities supporting the conflicting rules of decision, in *Felton v. Aubrey, supra,* it is stated:

"If the company has so long acquiesced in the continuous and open use of a particular place as a crossing as to justify the inference that it acquiesces in that use, it would seem to follow that it was bound to anticipate the presence of such licensees upon its track at the place where such crossing had been long permitted. In such a case it would not be consistent with due regard to human life, and to the rights of others, to say that such licensees are mere trespassers, or that the duty of the acquiescing company was no greater than if they were mere trespassers. Nonliability to trespassers is predicated upon the right of the company to a clear track, upon which it is not bound to anticipate the presence of trespassers. It therefore comes under no duty to a trespasser until his presence and danger are observed. But, if it has permitted the public for a long period of time to habitually and openly cross its track at a particular place, or use the track as a pathway between particular localities, it cannot say that it was not bound to anticipate the presence of such persons on its track, and was therefore not under obligation to operate its trains with any regard to the safety of those there by its license. This distinction between liability for the passive and active negligence of the owner of premises to licensees is recognized very clearly by the Court of Appeals of New York. *Barry v. Railroad Co.,* 92 N. Y. 290 [44 Am. Rep. 377]; *Byrne v. Railroad Co.,* 104 N. Y. 363, 10 N. E. 539 [58 Am. Rep. 512]."

Many authorities supporting the views of the court are cited in the opinion. In *Northern Pac. R. Co. v. Curtz,* 196 Fed. 367, 116 C. C. A. 403, there was evidence that after grain cars had been unloaded loose wheat had been left in the cars of the railroad company, and that for more than six years prior to the accident men, boys,

and girls daily and openly went into such empty cars to sweep and gather up loose wheat. There was evidence, too, that the railroad employees, including the switchmen, never drove any of these persons away, that there were no notices posted warning trespassers from the cars, and that no other warnings were given by the employees of the company. There was also evidence that the switchmen frequently told the boys where wheat could be found in the cars, and that a few minutes before the injury complained of, a switchman directed the plaintiff and his two little cousins to some cars, in one of which the plaintiff was sweeping wheat at the time of his injury, which was caused by other cars being suddenly thrown back against the car in which the children were gathering up the wheat. There was evidence tending to show that the company knew that children were accustomed to sweep wheat from these cars. In the opinion it was held that there was sufficient evidence to go to the jury to prove that the injured boy was a licensee, and not a trespasser, on the car. In the course of the opinion it is said:

"The occupant or owner of premises who invites, either expressly or impliedly, others to come upon them, owes to them the duty of using reasonable and ordinary diligence to the end that they be not necessarily or unreasonably exposed to danger; and an implied invitation to another to enter upon or occupy premises arises from the conduct of the parties, and from the owner's knowledge, actual or imputed, that the general use of his premises has given rise to the belief on the part of the users thereof that he consents thereto."

A very recent and apposite case is that of *O'Leary et ux. v. Pittsburg, G. H. & L. E. R. Co.*, 248 Pa. 4, 93 Atl. 771. There the accident, as here, occurred while the O'Leary boy was attempting to cross the track, and was

caused by the backward motion of the rear car of the train, which was put in motion by the engine at the western end of the train. There was no brakeman or flagman on the rear end of the train to give notice of its intended movement, nor was any signal by whistle or bell given before the train was started. There was evidence tending to show that the yards and tracks of the railroad company had been used as a playground with the company's knowledge and tacit acquiescence. In the opinion it was stated that, while it was true that the railroad company had a right to the exclusive use of its property where its tracks were located, and that it might have insisted upon such exclusive use and prohibited the entry upon it by any other party, and observing the rule of decision of that state that a railroad company has the exclusive right to the use of its tracks except at public crossings or places of permissive use by others, and passing upon the alleged error of the court in excluding testimony, had the plaintiffs been permitted to sustain their offer by proof, the evidence would have warranted the jury in finding that for many years prior to the accident, the part of the company's premises where the accident occurred had been used constantly as a playground by the children of the neighborhood with the knowledge of the company or its employees operating its trains. This, it was said, would have shown a permissive use of the premises by the defendant, which would have imposed duties upon the defendant in operating its trains quite different from those owed to persons using the premises without its acquiescence. As said by the court:

"In other words, the defendant company had the right to insist on the exclusive use of its tracks, and any person, infant or adult, going upon them would be a tres-

passer; yet, when constant use for many years had been made of them by the children of the community as a playground, with the defendant's knowledge and tacit acquiescence, the rights and duties of the parties changed, and those using the tracks under such circumstances cannot be regarded as trespassers to whom the company owed only a duty as such."

The conclusion was reached that, where a defendant has permitted and acquiesced in the use of its ground as a public playground, and the children of the community have used it as such without objection, it becomes the duty of the company to operate its trains so as to protect those who, by such permission, might be upon its tracks. Under the circumstances disclosed by the evidence it was the duty of the company to take such reasonable care in the operation of its trains over its track in the yards near the coal chute as to avoid injury to those who might be making permissive use of them. On account of the long-continued conduct of the boys who visited its railroad yards, with knowledge of the fact on the part of the railroad company, it was required to anticipate their probable presence on or about its tracks, and to exercise reasonable care in the operation of its trains in that vicinity. After citing many authorities, the rule concerning the liability of the company in such cases is thus announced in *Ashworth v. Southern R. Co.*, 116 Ga. 635, 43 S. E. 36, 59 L. R. A. 592:

"If a railroad company expressly invites or tacitly permits, persons to be upon its premises, or in or about its machinery, the company owes to such persons the duty, not only not to injure them when their presence becomes known, but also to anticipate their presence at the time when or the place where such invitation or permission would probably bring about their presence, and to take

such measures as ordinary prudence would require to prevent injury to them if they are, in fact, present. A railroad company is the owner of its right of way, its track, and its machinery, and is entitled to exclude therefrom others who have no interest or right therein. A railroad company which continuously permits persons to be upon its right of way or in or about its machinery at given times and places is put on notice by this conduct on its part that such persons may be present at such times and places, and by this conduct it imposes upon itself the duty, not only to prevent injury to such persons, but to anticipate their presence and take the precautions of any ordinarily prudent person to prevent injury to them."

A leading case (cited in *Felton v. Aubrey*) is that of *Barry v. New York Central & H. R. R. Co.*, 92 N. Y. 289, 44 Am. Rep. 377. There the intestate was a boy ten years old, who was killed by a backing train at a point where the public for thirty years had been in the habit of crossing the tracks. In the opinion of the court it was said that the ground of liability was negligence, and that the duty of the defendant to exercise reasonable care existed irrespective of the fact whether the plaintiff's intestate had a fixed legal right to cross the track or was there simply by the defendant's implied permission. In *Mitchell v. Boston & M. R. Co.*, 68 N. H. 96, 34 Atl. 674, it was held that knowledge of the existence and use of a pathway across the railroad yard was competent on the question of defendant's negligence, and that known public travel, whether licensed or unlicensed, across these tracks, would affect the measure of the ordinary care required of them, and it was said that the conduct of a person of average prudence in doing his lawful business was the legal standard of duty. It was further said:

"Such a person running a locomotive engine would manage it with greater or less caution according as he is passing through a mob, over the crowded streets of a city, the less-travelled highways of a village, the comparatively unfrequented country ways, or a territory where there is no crossing, and no reason to expect any one to be upon the track. The measure of his care would be proportionate to the danger of injury from the want of it. Knowledge that those who he knew were exposed to danger were wrongdoers would not diminish his vigilance. He would, if he could, avoid doing harm to trespassers, as well as to those who are exercising their lawful rights."

In *Garner et al. v. Trumbull*, 94 Fed. 321, 36 C. C. A. 361, in an opinion by Thayer, C. J., concurred in by Sanborn and Caldwell, JJ., it was urged by the receiver of the railway company that the child was a trespasser on the track; hence that the train operatives on that account owed it no duty until its presence was discovered, and they were under no obligation to anticipate its presence on the track, or to be on the lookout for it or other persons at the place where it was run over and killed. The opinion observes that there are some adjudged cases supporting that view, but the court says:

"We are persuaded that it is not a correct rule, as applied to those portions of a railroad track which many people have been in the habit of using as a footpath for a considerable period, without objection on the part of the railway company, although without any express license to do so. Train operatives ought to be required to take notice of such usages and conditions which actually exist, and to regulate their actions accordingly. A proper regard for the safety of persons and property intrusted to their charge, and for human life in general, should impel them to do so. When, therefore, for a considerable period, numerous persons have been accustomed to walk across a railroad track or along a railroad track between given

points, either for business or pleasure, railroad engineers should take notice of such practice, and, when approaching such places, should be required to exercise reasonable precautions to prevent injuring them. Knowing the usage which prevails, they may reasonably be required to anticipate the probable presence of persons on or near the track at such places, and to be on the lookout when their attention is not directed to the performance of their other duties. The natural impulses of a person who has a proper regard for the welfare of others would prompt him to thus act."

The opinion reviews a number of authorities, both federal and state, and announces a rule in full consonance with that urged by the defendant in error. Among the many authorities sustaining the foregoing rule are the following: *Ft. Worth & D. C. R. Co. v. Longino,* 54 Tex. Civ. App. 87, 118 S. W. 198; *St. L., A. & T. R. Co. v. Crosnoe,* 72 Tex. 79, 10 S. W. 342; *Conley v. Cincinnati, N. O. & T. Ry.,* 89 Ky. 402, 12 S. W. 764; *Patton v. E. Tenn. V. & G. R. Co.,* 89 Tenn. 370, 15 S. W. 919, 12 L. R. A. 184; *Murrel v. Missouri Pac. R. Co.,* 105 Mo. App. 88, 79 S. W. 505; *Featherstone v. Kansas City Terminal R. Co.,* 174 Mo. App. 664, 161 S. W. 284; *Morgan v. Wabash R. Co.,* 159 Mo. 262, 60 S. W. 195; *Hansen v. Southern Pac. R. Co.,* 105 Cal. 379, 38 Pac. 957; *Alabama G. S. R. Co. v. Guest,* 144 Ala. 373, 39 South. 654; *Green v. C. & W. M. R. Co.,* 110 Mich. 648, 68 N. W. 988; *Chesapeake R. Co. v. Rogers,* 100 Va. 324, 41 S E. 732; *Johnson v. Lake Superior, T. R. & T. Co.,* 86 Wis. 64, 56 N. W. 161; *Cassida v. Ore. Ry. & N. Co.,* 14 Ore. 551, 13 Pac. 438; *Troy v. Cape Fear & Y. V. R. Co.,* 99 N. C. 298, 6 S. E. 77, 6 Am. St. Rep. 521; *Chicago, B. & L. R. Co. v. Wymore,* 40 Neb. 645, 58 N. W. 1120; *Lindsay v Canadian Pac. R. Co.,* 68 Vt. 556, 35 Atl. 513; *Clampit v. C.*

& *St. P. R. Co.*, 84 Iowa, 71, 50 N. W. 673; *Swift v. Staten Island, etc., R. Co.*, 123 N. Y. 645, 25 N. E. 378; *Young v. Clark*, 16 Utah, 42, 50 Pac. 832; *Taylor v. Delaware & H. Canal Co.*, 113 Pa. 162, 175, 8 Atl. 43, 57 Am. Rep. 446; *Cahill v. Chicago, M. & St. P. R. Co.*, 74 Fed. 285, 20 C. C. A. 184.

Turning to the Oklahoma cases, we find that the facts involved in *Faurot v. Oklahoma Wholesale Groc. Co.*, 21 Okla. 104, 95 Pac. 463, 17 L. R. A. (N. S.) 136, readily distinguish that case from the one under consideration, and the opinion therefore furnishes no guide by which to determine the instant case. In *Rogers v. Chicago, R. I. & P. Ry. Co.*, 32 Okla. 109, 120 Pac. 1093, the proof showed that some of the hands working at a compress some distance from town had occasionally used the track longitudinally at the point of accident as a walkway to town, but failed to show that the railroad company or any of its employees permitted or knew of such use, or that the travel there was either frequent, continuous, or had continued for more than six or seven weeks, or to such an extent as to make a pathway, or to afford other means of its use by pedestrians; and, while recognizing the doctrine of the case at bar, it was held that the proof was not sufficient to constitute the injured party a licensee. The cases of *Atchison, T. & S. F. Ry. Co. v. Cogswell*, 23 Okla. 181, 99 Pac. 923, 20 L. R. A. (N. S.) 837, and *Atchison, T. & S. F. Ry. Co. v. Jandera*, 24 Okla. 106, 104 Pac. 339, 24 L. R. A. (N. S.) 535, 20 Ann. Cas. 316, are not in point; the question there decided involving other and different considerations. While perhaps not necessary to a decision in that case, the correct rule was, we think, adverted to in *Chicago, R. I. & P. Ry. Co. v. Stone*, 34 Okla. 364, 125 Pac. 1120, L. R. A. 1915A, 142, where it was

said that a railroad company must exercise ordinary care and caution commensurate with the risk of accident in operating its trains or cars at places where persons, although trespassers or mere licensees, are known or may be expected to be on the tracks, as in towns or cities, and for a failure to exercise such care it becomes liable, except where contributory negligence is shown. In *Wilhelm v. Missouri, O. & G. R. Co.*, 52 Okla. 317, 152 Pac. 1088, it was held to be a question of fact for the jury to determine whether the railroad company had acquiesced in the use of its track; it being shown that a footpath across and along a railroad track had been habitually used by the public for a number of years before the fatal injury without objection. It was said of a bare licensee upon a railroad track that the railroad company is bound to exercise that degree of care and watchfulness to protect against injuring him that is commensurate with the probability that persons may be upon its track at that point. The case at hand is one that presents a state of facts from which the jury might properly have found the railroad company liable. This it did, and, unless on account of error committed, or because of the size of the verdict, the judgment should be affirmed.

The assignment of error that the absence of a watchman or other employee at the end of the train was not the proximate cause of the injury is not well taken. The question as to what was the proximate cause of the injury was, and ordinarily is, a question for the jury, to be determined as a fact in view of the circumstances of fact attending it. *St. Louis & S. F. R. Co. v. Davis,* 37 Okla. 340, 132 Pac. 337; *Milwaukee & St. P. R. Co. v. Kellogg,* 94 U. S. 475, 24 L. Ed. 256. No complaint is made as to the giving or refusal of an instruction in this regard.

The question is argued apparently upon the sufficiency of the evidence. To our minds it is clear that plaintiff's injury was sustained by reason of the failure of the company to have an employee stationed at the rear end of the car at the time of the backward movement of the train; for it was while the boy was recrossing the track, by a sudden, and to him unexpected, movement of the train, that he was knocked down and injured.

Nor did the court err in giving instruction No. 4. This instruction, we think, correctly submitted to the jury the law by which they were to determine the question of the company's liability, and which question we have already considered. It is next urged that the court erred in giving instruction No. 3. This instruction told the jury that the burden of proving contributory negligence was upon the defendant, and that in determining whether jury that the burden of proving contributory negligence the jury might take into consideration his age, immaturity, and lack of discretion, if any, his experience and knowledge of the dangers incident to the operating of railroads, and further told the jury that the plaintiff was only held to the exercise of such degree of care and discretion as was reasonably to be expected from children of his age under like circumstances. The particular objections urged in the brief of counsel to the giving of this instruction need not be considered, as we find it to substantially state the law as requested by the defendant company in its requested instructions 32, 33, 34. Whether in all respects the instruction correctly states the law it is not necessary to determine, for, even though erroneous, being requested by defendant, it cannot be heard to complain. *Atchison, T. & S. F. Ry. Co. v. Davis et al.,* 26 Okla. 359, 109 Pac. 551.

Instruction numbered 6, the correctness of which is challenged, is a modification of defendant's requested instruction numbered 36, and is not open to the objection laid against it. The fact that it was admitted during the course of the trial that plaintiff was acquainted with the dangers incident to the operation of freight trains while being made up in the railroad yards made proof of the fact unnecessary. The admission did not impose upon plaintiff a higher degree of care than was to be expected from children of his age, capacity, and understanding, under like circumstances; and this was the standard by which his conduct was to be measured according to the language of the instruction. "Children of his age, capacity and understanding under like circumstances," would, of course, mean children such as plaintiff, acquainted with the dangers arising out of the movement of freight trains while switching and being made up; not those unacquainted with such dangers. The instruction required that his conduct be measured, not alone by the standard that was expected of other children of his age, but those of his capacity and understanding under like circumstances.

Requested instructions numbered 3, 8, 9, 13, 18, 25, 26, and 41 called for a submission of the case on a theory not warranted by law. By those instructions the jury were, in effect, told that the railroad company owed plaintiff, owing to his status, no higher duty than to refrain from wantonly or willfully injuring him, or to exercise ordinary care to prevent such injury after his peril or presence on the track was discovered. We have carefully read each of the several instructions, and have no hesitation in saying that their submission would have constituted reversible error, entertaining the view that we do

as to the rights of the plaintiff, and the duty owing and consequent liability of the railroad company.

For reasons already shown, the action of the court in permitting the witnesses R. E. Hodge and H. R. Perkins to testify that they had seen the boys picking up coal and playing on the tracks did not constitute error. Whether, in fact, the coal chute foreman, Perkins, was an employee of the defendant company, or of an independent contractor, need not be determined. His testimony as to knowledge of the custom of the boys in congregating upon the premises of the railroad was of the same nature as that of a number of other witnesses. That others who were admittedly employees of the railroad company knew the boys had frequented the premises for a long period of time was shown by plaintiff's evidence, and to some extent by some of the witnesses for the railroad company. Putting out of sight any question of the authority of Perkins to bind the company, the fact of notice to other employees remains. Such knowledge on the part of the employees was notice to the company, for which it must respond in damages; the other elements of liability being present.

It it next insisted that the trial court erred in not permitting the defendant company to prove that plaintiff was in the habit or had a custom of crawling underneath the cars whenever he found the tracks blocked and desired to cross the tracks so occupied. This testimony was offered in support of the company's defense of contributory negligence. "Of the probative value of a person's habit or custom, as showing the doing on a specific occasion of the act which is the subject of the habit or custom, there can be no doubt," it is said by counsel for plaintiff in

error, citing from section 92, Wigmore on Evidence. But the same author adds:

"There is, however, much room for difference of opinion in concrete cases, owing chiefly to the indefiniteness of the notion of habit or custom. If we conceive it as involving an invariable regularity of action, there can be no doubt that this fixed sequence of acts tends strongly to show the occurrence of a given instance."

And says the author, continuing:

"But in the ordinary affairs of life a habit or custom seldom has such an unvariable regularity. Hence it is easy to see why in a given instance something that may be loosely called habit or custom should be rejected, because it may not, in fact, have sufficient regularity to make it probable that it would be carried out in every instance or in most instances. Whether or not such regularity exists must depend largely on the circumstances of each case."

Discussing the precise question here involved, the author in section 65 alludes to the fact that a few courts have shown an inclination to admit exceptionally the character of a plaintiff charged with contributory negligence, as throwing light on the probability of his having acted carelessly on the occasion in question, provided that the other evidence leaves the matter in great doubt, or that the other evidence is purely circumstantial, or, as sometimes stated, that there are no eyewitnesses testifying. This rule the author criticizes, and says it is maintained in a few jurisdictions only, and has been expressly repudiated in many. See, also, Wigmore on Evidence, sec. 199. Though stated quite differently, the same principle is announced in 8 Enc. of Evidence, p. 939. Many authorities sustaining the rule will be found in the foregoing texts.

Whether or not plaintiff crawled underneath a train standing over the main crossing, on a day certain, was far from proof of a habit involving an invariable regularity of action. Conceding, however, that the question was properly asked, as appears from another question, we do not think that the court erred in excluding this testimony. That the plaintiff was a boy 11 years of age, whose habits as to prudence or negligence could hardly be said to be formed, furnishes an additional reason to that cited in the authorities named for rejecting the offer. Boyish impulses, rather than fixed habit, would furnish meager room for conjecture, and no evidence that what was done on one occasion would make it probable that the same act would in all likelihood be done in every instance or most instances.

Was the verdict excessive? It appears that the wheels of at least one of the cars ran over the plaintiff's right leg between the knee and the ankle, necessitating its amputation, and seriously mangled the left foot, necessitating also amputation of a portion of it. Dr. A. J. Miller, being asked the question, "Q. Where was it the cars ran?" answered: "Right across this way (indicating). The right leg began just about an inch above the ankle; the injury was upward and inward; and in the left foot it was across the conjunction between the articulations of the bones of the leg and the toes." The injuries permanently crippled the plaintiff, who was at the time of the injury a boy 11 years of age.

The question of excessive verdict has often been before the court, and to attempt to add to the reasoning or to cite additional authorities in support of the power of a reviewing court to direct the entry of a *remittitur*,

where it appears that the verdict is excessive, would be a work of supererogation on our part. Many authorities are cited, and a number of them reviewed, in the case of *Choctaw, O. & G. R. Co. v. Burgess*, 21 Okla. 653, 97 Pac. 271, in which case the rule is correctly announced that appellate courts should sparingly exercise the power of granting new trials on the ground of excessive damages, doing so only when it appears that the verdict is so excessive as *per se* to indicate passion or prejudice. In that case the plaintiff was a young woman 25 years of age, a wife and a mother. The testimony tended to show that she had sustained serious and permanent injuries that incapacitated her from attending to her domestic affairs and duties, and that the injuries "made her practically an invalid permanently." The court refused to disturb the verdict, which was for $5,500. In *Independent Cotton Oil Co. v. Beacham*, 31 Okla. 384, 120 Pac. 969, the plaintiff was by occupation a common laborer, 20 years of age, whose earning capacity was $1.50 per day at the time of the injury. The injury necessitated the amputation of his right leg below the knee, but was not accompanied by any complications, other than the ordinary pain and suffering incident to injuries of that kind. The jury returned a verdict for $25,000. Upon complaint in this court that the verdict was excessive, a *remittitur* for all in excess of $10,000 was directed. In *St. Louis & S. F. R. Co. v. Richards*, 23 Okla. 256, 102 Pac. 92, 23 L. R. A. (N. S.) 1032, a verdict for $6,300 for permanent injuries and loss of earning capacity of the plaintiff, who was the mother of two children, and who prior to the accident earned her own living by washing and running a boarding house, was held not to be excessive. A verdict for $2,000 was held not excessive in *City of Shawnee et al. v. Stankard,*

29 Okla. 133, 116 Pac. 803. There the plaintiff, a laboring man, sustained a dislocated shoulder, an injured ankle, and a sprained knee, from which he suffered great pain and agony, and it was believed that the injury to his shoulder was permanent. In *Muskogee Electric Traction Co. v. Reed,* 35 Okla. 334, 130 Pac. 157, the evidence showed that the plaintiff's right thigh was broken, and she was confined to her bed for 8½ weeks, and her doctor's bill amounted to $304, and at the time of the trial she was walking on crutches, and complained of great pain, being unable to bear her weight on the fractured limb, which had become shorter than the other, and the question of the healing of her limb was problematical. A verdict of $5,000 was held not excessive. In *Town of Fairfax v. Giraud,* 35 Okla. 659, 131 Pac. 159, the plaintiff, a music teacher 42 years of age, obtained judgment for $2,000 for personal injuries. It was shown that prior to the accident she earned not less than $12 to $15 per week, and for five or six months thereafter was totally unable to earn anything, and after that time had been able to earn only $4 or $5 per week; that her injuries were due to the breaking of both of the bones in one of her lower limbs just above the ankle, and that the other was badly sprained; and that she was seriously bruised as the result of her fall, suffering intensely for several months, which suffering continued until the day of the trial. A verdict for $2,000 was sustained. In *Muskogee Electric Traction Co. v. Mueller,* 39 Okla. 63, 134 Pac. 51, the plaintiff, a woman 55 years old, sustained a fracture in the region of the shoulder, from which she suffered great pain, and at the time of the trial, five months after the injury, was unable to lift her arm above her head. The verdict was for $1,500, and was held not excessive. In

*City of Guthrie v. Snyder,* 43 Okla. 334, 143 Pac. 8, the plaintiff was thrown from her buggy, both bones of her right leg being broken near her ankle, the fibula protruding through her stocking into the ground, and the broken tibia being forced through the skin, from which injuries she was permanently crippled. It was held that a verdict of $4,000 was not excessive. In *Chicago, R. I. & P. Ry. Co. v. De Vore,* 43 Okla. 534, 143 Pac. 864, L. R. A. 1915F, 21, the plaintiff was 34 years of age, physically strong at the time of the accident, had worked his way up to the position of engineer in the railway service, and was receiving an average of $125 to $130 per month. By the accident the sight of an eye was entirely destroyed, and he was thereby disqualified from ever again holding the position of engineer with any railroad company. He suffered great pain for a time, and was under the care of a physician for about four months. It was held that a verdict for $15,000 was not excessive. In *St. Louis & S. F. R. Co. v. Hart,* 45 Okla. 659, 146 Pac. 436, the plaintiff was a single man about 48 years old at the time of the injury. He had no trade or profession, nor was he fitted for any vocational employment. Prior to his injury he worked at odd jobs from day to day, and earned about $1.50 to $1.75 when at work. The verdict of the jury was for $10,000, and this court directed that a *remittitur* of $5,000 be entered. A verdict for $3,000 was held not to be excessive in *Missouri, Oklahoma & Gulf Ry. Co. v. Collins,* 47 Okla. 761, 150 Pac. 142. There plaintiff, who was 23 years of age, sustained a dislocation of his hip and bruises and injuries to his back. For four months from the date of the injury the sacro-sciatic nerve was completely paralyzed. He suffered intense agony for many weeks, was put in a plaster of paris cast and kept

in it for three weeks, was required to take opiates, and confined to his bed for something over three months, and for a time his urine had to be drawn with a catheter. It was four months from the time of the injury before he could leave his room, and 14 months thereafter before he could walk without the use of his crutches. His doctor bill was about $250, and time lost from work at the time of trial $255. In *Missouri, Oklahoma & Gulf Ry. Co. v. Parker,* 50 Okla. 491, 151 Pac. 325, the plaintiff, a drayman, was 54 years of age, and of former good health, with an earning capacity of $50 a month. His injuries, while serious, were not permanent in their nature. The jury returned a verdict for $14,000, and the trial court directed a *remittitur* of $4,000. Upon appeal to this court a further *remittitur* in the sum of $5,000 was directed.

The foregoing constitute the principal cases in this jurisdiction involving the question of an excessive verdict. In none of them, it will be seen, was the verdict in a sum equal to that in the present case. A verdict will not be set aside in a case of tort for excessive damages unless it clearly appear that the jury committed some gross or palpable error, or acted on some improper bias, influence, or prejudice, or have totally mistaken the rules of law by which the damage was regulated. Considering the age of the injured boy, the uncertainty of his earning capacity, the nature of the injuries sustained, which were unaccompanied by complications, other than the pain and suffering common to such injuries, and which, though permanent and very serious, but partially destroyed his capacity to do physical labor, it would seem from the size of the verdict that the jury erred in some one of the particulars named. Compensatory damages were all that

plaintiff was entitled to recover. The amount of the verdict, to our minds, is clearly in excess of any sum that could properly be based solely upon the idea of compensation. The statute authorizes the granting of new trials for "excessive damages appearing to have been given under the influence of passion or prejudice." Rev. Laws 1910, sec. 5033; *Choctaw, O. & G. R. Co. v. Burgess,* 21 Okla. 653, 97 Pac. 271.. We realize fully the importance that should attach to the verdict of a jury, and also know that juries, like courts, commit errors. This, we believe, the jury did.

But, as we are equally convinced that a case of liability was shown, if, therefore, a *remittitur* is filed for all in excess of the sum of $15,000, and interest thereon from date of verdict, within 15 days from the receipt of the mandate herein by the trial court, the judgment as thus corrected will be affirmed; otherwise the judgment will be reversed, and a new trial granted.

All the Justices concur, except HARDY, J., not participating.